(14 Misc. Rep. 474.)

### GREEN v. HERUZ et al.

(Common Pleas of New York City and County, Equity Term. November 19, 1895.)

1. COLONIAL GRANTS—EFFECT—BED OF STREAM.

The bed of Harlem creek (long since filled up), 1,200 feet from where it emptied into the Harlem river, passed under the grants of Gov. Nicolls (May, 1666, and October 11, 1667), and the grant of Gov. Dongan (March 7, 1686), of lands, together with creeks, etc., to the inhabitants of Harlem, and did not become the property of New York City, under the Dongan charter of April 27, 1686, by which it acquired title to the land between high and low water mark on the whole circuit of Manhattan Island, even though the creek was navigable and subject to the action of the tides.

2. DEED OF TRUST FOR CREDITORS—DISCHARGE BY LAPSE OF TIME.

One holding land under a foreclosure of mortgage, by action to which only the mortgagor is defendant, has title free and clear of deed of trust for creditors executed by the mortgagor after the mortgage, and before the foreclosure; the deed of trust being silent as to the duration of trust, and 25 years having elapsed from its execution, the trust, under such circumstances, by provision of 4 Rev. St. (8th Ed.) p. 2440, § 67, being deemed discharged, and the estate reverted to the grantor.

3. SALE OF LAND—RESCISSION BY PURCHASER—LIEN FOR TAXES.

A purchaser of land may refuse to complete purchase, and recover deposit and expenses of searching title, there being unpaid taxes, which are a lien on the property.

Action by Adolf Green against John R. Martinez Heruz, as executor, and others, to recover the amount of a deposit made on a contract for the sale of certain real estate, situate on the south side of 107th street, between 2d and 3d avenues, and known as "No. 212 East 107th Street," in the city of New York, and counsel fees incurred in the examination of the title; the ground alleged being that defendant could not give a good and marketable title to the premises. Judgment for plaintiff.

Goldfogle & Cohn (Charles L. Cohn, of counsel), for plaintiff.

Ambrose G. Todd (Reeves & Todd, of counsel), for defendant Heruz.

Mandelbaum Bros. (Max Mandelbaum, of counsel), for defendant Anderson.

GIEGERICH, J. The plaintiff refused to accept the title offered upon three grounds, which will be considered separately, the other objections having been waived upon the trial.

The first objection is that a portion of the premises in question was included and situated within what was formerly a navigable stream of water, commonly known as the "Harlem Creek and Mill Pond," the title to which did not vest in the defendants or their

grantors, but is vested either in the people of the state of New York or in the city of New York. It appears by the conceded facts that the premises in question lie within what was formerly the "Town of Harlem," and formed part of the lands and premises which were granted by the patents hereinafter referred to, under which, through mesne conveyances, the defendants claim title; that Gov. Nicolls, by a patent dated May, 1666, granted unto the freeholders and inhabitants of the town of Harlem, "their heirs, successors, and assigns, and to each and every of them, their particular lots and estates in the said town, or any part thereof"; that Gov. Nicolls by a second patent, dated the 11th day of October, 1667, ratified, confirmed, and granted unto the persons therein named, "as patentees, for and in behalf of themselves and their associates, the freeholders and inhabitants of the said town, their heirs, successors, and assigns," the same premises granted by the last patent, "together with all the soils, creeks, quarries, woods, meadows, pastures, marshes, waters, lakes, * * * to ye said lands and premises within the said bounds and limits set forth"; and that these grants were further confirmed by Gov. Dongan by patent dated the 7th day of March, 1686.

It is claimed by the plaintiff that a portion of the premises in question was situated within the bounds of Harlem creek; that this creek at that point was navigable, and that the tide rose and fell in it; that, therefore, the land between high and low water did not pass to the freeholders of said town by virtue of Gov. Nicolls' patents; but that by the terms of the Dongan charter of April 27, 1686, the city of New York acquired title to the land between the high and low water marks on the whole circuit of Manhattan Island (Mayor, etc., of New York v. Hart, 95 N. Y. 443), which included the land covered by tide water in Harlem creek. This creek, it is conceded, has long since been filled up. There is no evidence in this case that the said creek was navigable or subject to the action of the tides. Assuming, however, this to have been the case, the lands, nevertheless, belong to the successors in interest of the freeholders, and not to the city. Breen v. Locke, 46 Hun, 291. In the case just cited, the supreme court, in the First department, held that lands situated along a creek which ran into the Harlem river at 125th street, which were covered by the waters of the river at high tide, passed to the freeholders by Govs. Nicolls' and Dongan's patents, and not to the city.

In speaking for the court, Mr. Justice Bartlett says:

"There would be no question here if this creek had been merely a tideless stream flowing into the Harlem. The difficulty arises from the fact that it was a stream through which the tide from the Harlem river set back, so as to check the steady northerly flow of the creek which prevailed except when the tide was coming in, and broadened the creek at the place where these premises were situated, from 6 feet in width at low tide to a width of 200 feet at high tide. Did this setback of the tide, producing these effects, make the creek an integral part of the Harlem river? We think not. An inspection of the topographical map between pages 39 and 40 of the printed case goes very far towards satisfying us on this point. It would seem very inaccurate for any one, using language in its ordinary sense, to speak of these premises, as shown on that map, as being situated on the Harlem river, or any part of it. Naturally a person, endeavoring to describe their location

in general terms, would say they were partly in the bed and partly on the shore between high and low water mark of a creek leading into the Harlem. There was nothing covelike about this creek, even when the tide in it was high. The shore contours were those of a widened stream. The land in dispute was 898 feet from the main body of the Harlem river at high tide. It is difficult to perceive how the creek at this point could be of any value or importance to the city of New York in a commercial sense. The city was to be the seaport, says the court of appeals in Mayor, etc., of New York v. Hart, supra, and for this purpose its water front was to girdle the whole island, while the village [of Harlem] was meant for a rustic hamlet, whose inhabitants should own cattle rather than ships. But it does not seem to us that the portion of this creek upon which these premises were located constituted any part of the water front thus spoken of in that case. The fact that the creek there has been filled up, and that a part of it is covered by the roadbed of Eighth avenue, is pretty conclusive evidence that it was valueless for any use connected with shipping."

These arguments apply directly to the case at bar. The premises appear, from the map before me, to have been situated upon the Harlem creek, some 1,200 feet from the main body of the river at high tide, and in fact their situation with relation to the creek, river, and tide water appears to have been almost identical with that of the property described in Breen v. Locke, supra. This conclusion was arrived at by Mr. Pirsson, in his able treatise on the "Dutch Grants, Harlem Patents, and Tidal Creeks" (page 75); and by Hon. Richard O'Gorman and Hon. William C. Whitney, in opinions, submitted by them to the comptroller when they were counsel to the corporation, which will be found at pages 167 and 170 of the above treatise.

This question does not seem to have been directly before the court of appeals in Roberts v. Baumgarten, 110 N. Y. 380, 18 N. E. 96, cited by plaintiff's counsel, which was an action in ejectment; and the decision rested upon the rule that the plaintiff in such an action must recover upon the strength of his own title, and may not rely upon any supposed or actual weakness in that of his adversaries. Neither does it appear that the attention of the court was called to the language of the Nicolls and Dongan grants.

The second objection is that one Charles Henry Hall, a former owner of the premises in question, did, by deed bearing date the 8th day of November, 1839, and recorded the 22d day of November, 1839, convey the lot in question, with other lands, to Charles M. Hall and David P. Hall, in trust for the benefit of creditors, and that such trustees have not reconveyed the same to said Charles Henry Hall, or to any of his subsequent grantors. It appears by the conceded facts that the said Charles Henry Hall executed a mortgage to Edward Sanford, to secure the payment of $26,000, which bears date July 15, 1835, and was recorded on the 18th day of August, 1839; that the said Edward Sanford, by assignment bearing date the 17th day of August, 1839, and recorded the 14th day of September, 1839, assigned the said mortgage to Margaret McGown, who brought suit for the foreclosure of the same in chancery before the vice chancellor, First circuit, against Charles Henry Hall, Edward Sanford, and others, and that in such suit the said David P. Hall and Charles H. Hall were not made parties defendant; that a decree of foreclosure and sale was thereafter granted and entered in said action, and in pur-

suance thereof the premises were sold to Andrew McGown, from whom, through mesne conveyances, the defendants derive title, and to whom the master in chancery conveyed the premises by deed dated November 18, 1841, and recorded December 29, 1841. Plaintiff claims that the title to the premises in question still remains in David P. Hall and Charles M. Hall, their legal representatives and successors, subject to a sale thereof for the payment of the debts of the said Charles Henry Hall, and that the said lands "could not be aliened or sold without a discharge from the said creditors, or without some satisfactory proof that their claims had been adjusted, satisfied, and paid. The deed of trust is silent as to the duration of the trust. There was no evidence adduced that the trustees ever entered upon the discharge of their duties, or took possession of the trust property. The only evidence presented upon the subject under consideration was the deed in question. As more than 25 years have elapsed since the creation of the trust, such trust must, under the circumstances, be deemed discharged, and the estate reverted to the grantor (4 Rev. St. pt. 2, tit. 2, c. 1, art. 2, § 67 [Banks Bros.' 8th Ed., p. 2440]; Kip v. Hirsh, 103 N. Y. 565, 9 N. E. 317; Mills v. Husson, 140 N. Y. 99, 35 N. E. 422), whose equity of redemption was cut off by the decree of foreclosure and sale in the above suit, to which he was made a party defendant, and by which his heirs and assigns are bound. Hence the defendants hold the title to the premises in question free and clear of any claim of title on the part of the trustees. Assuming, however, but without so holding, that the trust has not ceased, the trustees would at most have a right to bring an action to redeem the premises from the mortgage, and this right, in my opinion, has been barred. Code Civ. Proc. § 379; Shriver v. Shriver, 86 N. Y. 575, 580.

The third and last objection is that the premises in question were sold in the year 1886 for the taxes imposed thereon for the year 1882. It appears from the evidence that such a sale had taken place, but that no certificate had been issued. The property, however, was not redeemed therefrom until after this action was brought. The plaintiff's attorney attended at the place fixed for the closing of the title, and objected upon this ground, and demanded the return of the deposit and the payment of $250 counsel fee, which was refused. The defendants did not then, nor at any time thereafter, offer to redeem or clear the premises in question from incumbrances, or make an offer of any kind. Irrespective of the tax sale, the unpaid taxes were a lien upon the property, and the defendant could not give a good and marketable title until they were discharged. The plaintiff was therefore justified in refusing to complete the purchase, and is entitled to recover back his deposit and expenses in searching the title. Morange v. Morris, *42 N. Y. 48; Hartley v. James, 50 N. Y. 38.

Judgment accordingly.